IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Howland Company, LLC and  :
John Evan,  :
    Petitioners  :
      :
   v.    : No. 214 C.D. 2025
      :
Department of Labor and Industry, : Submitted: May 12, 2026
Bureau of Occupational and  :
Industrial Safety,  :
    Respondent  :

BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge
    HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE McCULLOUGH     FILED: June 24, 2026

  Howland Company, LLC (Howland) and John Evan (Evan) (together, Petitioners) petition for review of the January 22, 2025 order of the Secretary of Labor and Industry (Department), which adopted in full the proposed adjudication and order of a Hearing Officer imposing a civil penalty of $14,000.00 and a three-year suspension of Petitioners' lead abatement licenses and certificates. The penalties were imposed based on findings that Petitioners violated various requirements of the Lead Certification Act (Act),[1] the Department's lead abatement regulations codified in Chapter 203 of Title 34 of the Pennsylvania Administrative Code (Code), and work practice guidelines promulgated by the federal Environmental Protection Agency (EPA) and Department of Housing and Urban Development (HUD).

---

[1] Act of July 6, 1995, P.L. 44, 35 P.S. §§ 5901-5916.

In this Court, Petitioners argue that the Bureau of Occupational and Industrial Safety (Bureau) failed to prove violations of the Act. They further argue that the three-year suspensions are excessive.

After careful review, we affirm.

## I.      BACKGROUND AND PROCEDURAL HISTORY

The facts underlying this case largely are undisputed and may be summarized as follows.[2]

The Department is accredited by the federal government to operate the lead abatement program in the Commonwealth. There are five lead certification disciplines in Pennsylvania, each of which requires the completion of an accredited training program. (Proposed Adjudication, Findings of Fact (FOF) ¶¶ 13-15.) The Act requires both lead abatement companies and their employees to be certified, and the certifications must be renewed each year. *Id.* ¶¶ 21-22. To be certified, lead abatement companies must agree to employ only individuals who are certified to perform lead abatement work and follow approved lead abatement practices. *Id.* ¶ 23.

Prior to the performance of any lead abatement work, a risk assessor tests components of a particular project for suspected lead and prepares a risk assessment report. The report indicates where lead is present or, alternatively, may simply assume that all painted surfaces contain lead. *Id.* ¶¶ 32-33. At least five days prior to beginning lead abatement work, companies must provide written notice to the Bureau, which notice must be provided on a form approved by the Department and include an assessment report prepared by a risk assessor or inspector. *Id.* ¶¶ 34-35. *See* 35 P.S. § 5911 (notification requirements prior to conducting lead abatement work). The

---

[2] The facts are taken from the Hearing Officer's Proposed Adjudication issued on August 7, 2024, and from this Court's single-judge memorandum opinion issued on October 28, 2025, denying Petitioners' Application for Supersedeas and Stay Pending Appeal (Supersedeas Application).

2

required notice must be reviewed and approved by the Bureau prior to the commencement of any abatement work. (FOF ¶ 36).

Howland is certified to perform lead abatement work in Pennsylvania and maintained, up to and through the current proceedings, the certifications required for doing so. *Id.* ¶ 25. Howland performs lead abatement services in 4 Pennsylvania counties and has performed approximately 100 abatement jobs since 2021. *Id.* ¶ 27. Evan owns Howland and has been a certified lead abatement supervisor since 2018. *Id.* ¶¶ 29-30.

The challenged sanctions at issue in this appeal arise from three separate orders to show cause issued by the Bureau on August 15, 2022, April 19, 2023, and August 21, 2023. In the first, nine-count order to show cause (First OSC) issued on August 15, 2022, the Bureau alleged that, during a March 21, 2022 inspection of Petitioners' Woodward Avenue job site in McKees Rocks, Pennsylvania, the following violations were observed: (1) a worker and supervisor conducted lead abatement work without lead certifications; (2) no certified supervisor was present; and (3) no containment access log was maintained. (Proposed Adjudication at 1; FOF ¶¶ 58-61.) The First OSC also alleged that, on April 11, 2022, the following violations were observed at Petitioners' job site on Cunningham Avenue in New Castle, Pennsylvania: (1) compliant lead hazard signs were not posted correctly; (2) proper abatement setup practices and procedures were not followed; (3) workers were utilizing improper cleaning techniques; (4) doors containing lead were not properly isolated; (5) workers did not wear appropriate protective clothing or personal protective equipment (PPE); and (6) air monitoring results were not available. (Proposed Adjudication at 1-2; FOF ¶ 69-73.)

In the second, four-count order to show cause (Second OSC) issued on April 19, 2023, the Bureau alleged that, during a December 6, 2022 inspection of Petitioners' worksite on Walnut Street in Bessemer, Pennsylvania, the following violations were observed: (1) appropriate setup procedures were not followed; (2) utilization of improper cleaning techniques; (3) doors and trim containing lead were not properly isolated; and (4) workers lacked appropriate protective clothing. (Proposed Adjudication at 2; FOF ¶¶ 81-84.)

In the third, four-count order to show cause (Third OSC) issued on August 21, 2023, the Bureau alleged that, during a July 24, 2023 inspection of Petitioners' worksite on Huron Avenue in New Castle, Pennsylvania, a worker was onsite without an appropriate lead certification. The Third OSC further alleged that, during an August 8, 2023 inspection of Petitioners' job site on Park Avenue in New Castle, Pennsylvania, the following violations were observed: (1) a high efficiency particulate air (HEPA) vacuum was not initially onsite; (2) critical barriers were not in place; (3) protective polyethylene sheeting (poly) was not properly secured; and (4) paint chips were not properly contained. (Proposed Adjudication at 3; FOF ¶¶ 96, 100.)

After a consolidated two-day hearing[3] on February 21-22, 2024, and the filing of post-hearing briefs, Hearing Officer Peter Kovach (Hearing Officer) made extensive findings of fact and conclusions of law, in which he sustained eight of the nine counts alleged in the First OSC, three of the four counts alleged in the Second OSC, and all four counts alleged in the Third OSC. More specifically, the Hearing Officer sustained the following 14 violations:

> First OSC, Count One – 34 Pa. Code § 203.4 (worker and supervisor present without lead abatement certifications); Conclusions of Law (COL) ¶ 5.

---

[3] All three OSCs were consolidated for disposition on September 11, 2023. (R.R. at 47a.)

4

First OSC, Count Two – 40 C.F.R. § 745.227(e)(2) (no licensed supervisor present at worksite); COL ¶ 6.

First OSC, Count Three – 34 Pa. Code § 203.6(b)(1) (no list of individuals engaged in lead abatement at worksite); COL ¶ 7.

First OSC, Count Five – 24 C.F.R. § 35.1345, 2350 (improper ground protection); COL ¶ 9.

First OSC, Count Six – 24 C.F.R. § 35.1350(c) (improper cleaning techniques); COL ¶ 10.

First OSC, Count Eight – 29 C.F.R. § 1926.62 (proper protective clothing); COL ¶ 12.

First OSC, Count Nine – 29 C.F.R. § 1926.62 (proper PPE); COL ¶ 13.

Second OSC, Count One – 24 C.F.R. §§ 35.1345, 35.1350 (improper abatement setup procedures and practices); COL ¶ 14.

Second OSC, Count Two – 24 C.F.R. § 35.1350(c) (improper cleaning techniques); COL ¶ 15.

Second OSC, Count Four – 29 C.F.R. § 1926.62 (proper protective clothing); COL ¶ 17.

Third OSC, Count One – 34 Pa. Code § 203.4 (worker present without proper lead certification); COL ¶ 18.

Third OSC, Count Two – 24 C.F.R. §§ 35.1345, 35.1350 (improper abatement setup procedures and practices); COL ¶ 19.

Third OSC, Count Three – 24 C.F.R. § 35.1350 (protection of occupants' personal property); COL ¶ 20.

Third OSC, County Four – 29 C.F.R. § 1926.62 (proper protective clothing); COL ¶ 21.

The Hearing Officer dismissed three counts alleging the failure to post proper lead hazard signage at the Cunningham Avenue site, failure to isolate lead-containing garage doors at the Cunningham Avenue site, and insufficient ground protection at the Walnut Street site. (COL ¶¶ 8, 11, 16.)

As to sanctions, the Bureau requested five-year suspensions of Petitioners' certifications and licenses together with a civil penalty of $49,000.00 based on the Act's second offense penalty enhancement provision, Section 10(d)(2), 35 P.S. § 5910(d)(2).[4] The Bureau argued that all of the counts alleged in the Second and Third OSCs were no longer first offenses given the violations alleged in the First OSC, and therefore enhanced penalties were appropriate. The Hearing Officer rejected the argument, concluding that, because no final order or settlement agreement had been entered or reached as to the counts alleged in the First OSC, they could not constitute first offenses for purposes of the penalty enhancement. Accordingly, all counts in all three OSCs would be treated as first offenses. (Proposed Adjudication at 30-31, 50.)

Because the Bureau proved 14 of the 17 alleged violations, the Hearing Officer recommended the imposition of a penalty of $1,000.00 for each violation, totaling $14,000.00. *Id.* at 50. As to whether suspensions were appropriate and, if so, their length, the Hearing Officer concluded that five-year suspensions were excessive. He nevertheless noted that, under Section 10 of the Act, 35 P.S. § 5910, a three-year suspension was appropriate given the multiple violations that were observed on at least five different job sites over a period of approximately 16 ½ months. *Id.* at 53-54. The Hearing Officer also noted that, although the violations constituted first offenses, Petitioners previously had been warned by site inspectors of various violations of the Act, which warnings went unheeded. *Id.* at 50; FOF ¶ 103.[5]

---

[4] Section 10(d)(2) of the Act provides for the "[i]mposition of an administrative penalty of not more than $1,000 for the first offense, not more than $5,000 for the second offense and not more than $10,000 for the third and each subsequent offense." 35 P.S. § 5910(d)(2).

[5] Specifically, the Hearing Officer found that Petitioners previously had been warned of the following Act violations at other job sites: (1) workers at job sites without required PPE gear; (2) a working HEPA vacuum absent from some worksites; (3) ineffective and improper use of poly at

**(Footnote continued on next page…)**

6

Petitioners filed exceptions to the Hearing Officer's Proposed Adjudication and Order, which were effectively overruled by the Secretary's January 22, 2025 order adopting the Proposed Adjudication and Order in total. Petitioners petitioned for review in this Court on February 21, 2025, after which they applied for a supersedeas first with the Department and then with this Court. Both requests were denied.[6]

## II. ISSUES

Petitioners present two issues for our consideration.[7] They first argue that the Department erred in determining that the Bureau met its burden to prove violations of the Act because the Bureau failed to prove the existence of lead at each of the

---

worksites to contain lead hazard and avoid contamination; (4) hazardous items not appropriately covered and wrapped; and (5) lack of appropriate signage at worksites. (FOF ¶ 103.) The Bureau also introduced several prior letters it sent to Petitioners identifying specific violations, advising as to how to remedy them, and providing Bureau contact information if additional information or help was needed. (Reproduced Record (R.R.) at 415a-16a, 423a-24a, 510a-14a.)

[6] In a single-judge memorandum opinion, we concluded, in part, that Petitioners were not entitled to a supersedeas because they did not make a strong showing that they are likely to succeed on the merits. *Howland Company, LLC and John Evan v. Department of Labor and Industry, Bureau of Occupational and Industrial Safety* (Pa. Cmwlth., No. 214 C.D. 2025, filed October 28, 2025) (McCullough, J.) (single-judge op.), slip op. at 6-8.

[7] Our review in this context is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact made by an administrative agency are supported by substantial evidence in the record. *Pennsylvania Physical Therapy Association v. Oleksiak*, 265 A.3d 849, 856 n.7 (Pa. Cmwlth. 2021) (*en banc*) (citing Section 704 of the Administrative Agency Law, 2 Pa.C.S § 704). As to questions of law, however, we exercise plenary, *de novo* review. *Id.* (citations omitted).
    Importantly, in reviewing an agency's exercise of discretion, we do not substitute our own discretion for that of the agency, and we may not reverse merely on the ground that we might have reached a different result. *Better Bets Ventures, LLC v. Pennsylvania Gaming Control Board*, 332 A.3d 1204, 1221-22 (Pa. 2025) (citing, in part, *Slawek v. State Board of Medical Education and Licensure*, 586 A.2d 362, 365-66 (Pa. 1991)). Instead, we review for arbitrary agency action or manifest or flagrant abuses of discretion, which include the capricious disregard of material evidence. *Id.* at 1222.

inspected job sites. Petitioners argue secondly that the Department erred in imposing three-year suspensions because (1) Petitioners improved their compliance with the Act and have successfully completed over 100 lead abatement projects in Pennsylvania, and (2) the underlying violations were *de minimis* first offenses.

## III. DISCUSSION

### A. The Act in General

The General Assembly, recognizing that both lead poisoning and improper lead abatement pose significant health hazards to Pennsylvania residents, enacted the Act to regulate lead-based paint activities, establish training programs for individuals and entities engaged in lead-based paint activities, and monitor and regulate those activities and related cleanup, disposal, and postabatement procedures. Section 5902(a), (b) of the Act, 35 P.S. § 5902(a), (b). In its regulations promulgated pursuant to the Act, *see* Section 5904(a), (b) of the Act, 35 P.S. § 5904(a), (b), the Department has incorporated by reference various lead poisoning prevention and lead-related work practice guidelines, standards, and regulations established by the EPA and HUD. *See* 34 Pa. Code §§ 203.2(d), 203.3(a), 203.4(a), 203.6(a) (referencing, in part, 40 C.F.R. Part 745 (Lead-Based Paint Poisoning Prevention in Certain Residential Structures); 24 C.F.R. Subtitle A, Part 35 (Lead-Based Paint Poisoning Prevention in Certain Residential Structures)).

### B. Petitioners' Issues

#### 1. Lead Presence at the Worksites

Petitioners first argue that the Bureau failed to carry its burden to establish any of the violations alleged in the OSCs because the Bureau failed to prove that lead or actual lead abatement was present at any of the job sites. (Petitioners' Br. at 24.) Petitioners do not, in this respect, contest any of the violations on the ground that the

8

conduct charged in the OSCs did not occur.  Rather, Petitioners assert that the presence of lead or actual lead abatement must be established to prove any violations of the Act, and introduction of the original risk assessment reports for job sites is the only acceptable method of proof.  Thus, because the Bureau did not introduce the risk assessment reports for the subject job sites,[8] Petitioners insist that the Bureau failed to prove any violations of the Act.  *Id.* at 24-27.  We disagree.

As to violations, Section 10(a) of the Act provides as follows:

> **(a) General rule.--**A person shall not cause, suffer, permit or allow a lead-based paint activity to be performed in violation of any provision of this [A]ct or regulations promulgated under this [A]ct; nor shall any person cause, suffer, permit or allow the performance of any act or operation in violation of any order issued by the [D]epartment pursuant to this [A]ct or regulations promulgated under this [A]ct.

35 P.S. § 5910(a).  *See also* 34 Pa. Code § 203.9(a).  "Lead-based paint activities" are defined as follows:

> (1) With respect to target housing,[9] the term includes risk assessment, inspection and abatement.
>
> (2) With respect to a public building constructed before 1978 or any commercial building, bridge or other structure or superstructure, the term includes identification of lead-based paint and materials containing lead-based paint, deleading, removal of lead from bridges and demolition.

---

[8] After the Hearing Officer closed the record, the Bureau moved to introduce the abatement notices that Petitioners provided to the Bureau, which would have included the risk assessment reports for each job site.  (Proposed Adjudication at 34 n.11.)  The Hearing Officer denied the motion, *see id.*, and that decision is not at issue in this appeal.

[9] "Target housing" includes "any housing constructed prior to 1978 or any zero-bedroom dwelling" and excludes "housing for the elderly or persons with disabilities unless any child who is less than six years of age resides or is expected to reside in such housing."  Section 3 of the Act, 35 P.S. § 5903.

35 P.S. § 5903. *See also id.* (defining "risk assessment," in part, as "onsite investigation to determine and report the existence, nature, severity and location of lead hazards in residential dwellings"; defining "inspection" to include a "surface-by-surface investigation to determine the presence of lead-based paint" and the "provision of a written report explaining the results of the investigation"; and defining "abatement" to include removal, containment, and replacement of lead-based paint and all associated "preparation, cleanup, disposal, and postabatement activities").

First, there is no indication anywhere in the Act that lead must in fact exist on job sites before any violations of the Act may be found to have occurred. Rather, violations of the Act may be found where certified/licensed individuals or companies fail to comply with the Act's requirements during any "lead-based paint activity," which expressly includes risk assessment, inspection, and identification of lead-based paint. 35 P.S. §§ 5910(a), 5903. Those activities do not *require* the presence of lead; rather, they are designed to *determine* the presence of lead. Further, to suggest, as Petitioners do, that lead abatement companies need only take safety precautions, wear appropriate gear, place appropriate warning signage, and monitor who enters and exits a job site *after* lead is discovered would defeat entirely the preventative purpose of those requirements. Thus, we reject outright Petitioners' argument that lead must in fact be present for violations of the Act to occur.

Second, we disagree with Petitioners' assertion that the Bureau had to introduce written risk assessment reports to prove, by a preponderance of the evidence,[10] that lead-based paint activities had commenced at all of the subject job

---

[10] The burden of proof to establish a case before an administrative tribunal is a preponderance of the evidence. *Sherman Hostetter Group LLC v. State Board of Auctioneer Examiners*, 336 A.3d 286, 292 (Pa. Cmwlth. 2025) (citing, in part, *Samuel J. Lansberry, Inc. v. Pennsylvania Public Utility Commission*, 578 A.2d 600, 602 (Pa. Cmwlth. 1990)).

sites.  Petitioners argued similarly before the Department, which rejected those arguments with the following reasoning:

> By way of initial observation, Ms. [Slaybaugh][11] credibly testified that before lead abatement work occurs, a notification must be provided to the Bureau at least five (5) days before the abatement begins; that notification is required to include a lead-based paint risk assessment report for the property.  The assessment report is prepared by a licensed/certified risk assessor who tests the various areas of a potential job[ ]site and outlines the specific areas on the property where lead must be abated (or, in the alternative to specific testing, the report may simply presume that all painted surfaces contain lead and direct their abatement appropriately).  The Bureau will return the notification to the company if required information is missing or other information needs to be corrected.  Consequently, it is somewhat disingenuous for [Petitioners] to argue that the [Bureau] has not proven that lead existed on the propert[ies].  The inspections were triggered by work notifications submitted by [Petitioners] which, by necessity, would have included an assessment report indicating the presence of lead at each of the properties.
>
> . . . .
>
> [T]he testimony of the [i]nspectors, the investigation reports, and in some cases, photographs taken at the locations demonstrate by a preponderance of the evidence that lead abatement work had been initiated at each of the properties referenced in the OSCs by the time the [i]nspector arrived at the property.  Therefore, general job[ ]site requirements such as possessing an active Pennsylvania lead abatement-related license, having a supervisor present on the first and final days of work, proper placement of ground protection, etc., would be applicable regardless of whether a specific door or window was part of the abatement plan.  Finally, for many of the areas, the work area was set up in such a way as to

---

[11] Christina Slaybaugh is an Administrative Officer 3 for the Bureau's Certification, Accreditation, & Licensing Division.  (FOF ¶ 1; R.R. at 780a.)

indicate that abatement work was being performed (e.g., poly was placed on the ground outside the entry and a vertical poly sheet was hung inside the unpainted stone [entryway] of the Walnut Street [p]roperty, making it more likely than not that the entry door which had been removed was part of the abatement plan). Additionally, for the majority of the alleged violations, [Petitioners] did not offer specific testimony challenging that a particular area or piece of debris did not contain lead; the notable exception being the testimony regarding the garage door at the Cunningham Avenue [p]roperty.

(Proposed Adjudication at 34-35.)

We agree with the Department's analysis. The Bureau proved by a preponderance of the evidence that lead-based paint activities, including lead abatement itself, had begun at all of the job sites where violations were observed. Those activities would not have begun if the Bureau had not reviewed the risk assessment reports and determined that the results warranted abatement. Thus, we agree with the Department that the Bureau carried its burden to prove all of the subject violations by a preponderance of the evidence.

## 2.    Length of Suspension

Petitioners next argue that the Department erred as a matter of law in imposing three-year suspensions[12] of Petitioners' lead abatement licenses and certifications. (Petitioners' Br. at 28.) Petitioners assert that (1) the underlying violations are, at best, *de minimis* first offenses, (2) they have made progress in improving their compliance with the Act, (3) they have successfully completed many other lead abatement jobs without issue, and (4) the violations, which occurred over a period of 16 ½ months, did not harm or otherwise compromise the health and safety of any Pennsylvania residents. *Id.* at 28-29. Although we appreciate Petitioners'

---

[12] Petitioners do not challenge the civil penalty of $14,000.00.

arguments, we cannot conclude that the Department erred as a matter of law or abused its discretion in imposing the suspensions.

As to penalties, Section 10(d) and (e) of the Act provide:

**(d) Penalties.--**In addition to the sanctions or remedial orders provided in this section, a person who fails to comply with a requirement of this act or a regulation promulgated under this act or who fails to obey an order issued by the department may be subject to any of the following penalties:

(1) Denial, suspension or revocation of accreditation or certification for a person, training provider or contractor who does any of the following:

(i) Fraudulently or deceptively obtains or attempts to obtain accreditation or certification.

**(ii) Fails to meet the requirements of this act or regulations adopted under this act.**

**(iii) Fails to meet applicable Federal or State standards relating to lead-based paint activities.**

(iv) Fails to pay a required fee.

(2) Imposition of an administrative penalty of not more than $1,000 for the first offense, not more than $5,000 for the second offense and not more than $10,000 for the third and each subsequent offense.

(3) Issuance of an order to cease any lead-based paint activity immediately.

(4) Initiation of legal action or proceeding in a court of competent jurisdiction.

**(e) Continued violations.--**Each day a violation continues to exist shall constitute an additional, separate and distinct violation for which a separate penalty shall be imposed.

35 P.S. § 5910(d), (e) (emphasis provided). Section 203.9(d)(1)-(2) of the Department's regulations further provides:

(d) *Penalties.* In addition to the sanctions or remedial orders provided in this section, a person who fails to comply with a

13

requirement of the [A]ct, this chapter or who fails to obey an order issued by the Department, may be subject to one or more of the following penalties:

(1) Denial, suspension or revocation of accreditation or certification for a person, training provider or contractor as provided in § 203.5 (relating to denial, suspension or revocation of certification or accreditation).[13]

(2) Administrative penalties of not more than $1,000 for the first offense, not more than $5,000 on the second offense and not more than $10,000 for each subsequent offense. Each day a violation continues to exist shall constitute an additional, separate and distinct violation.

(i) If the violating person is a contractor, in determining the penalty, consideration shall be given to the appropriateness of the penalty to the size of the business of the person charged, taking into account the number of employes employed by that person, dollar volume of sales or business, amount of capital investment and financial resources and other information as may be available relative to the size of the business of the person.

---

[13] Section 203.5 of the Department's regulations generally tracks Section 10(d)(1) of the Act and provides the following grounds for suspension:

(i) Fraudulently or deceptively obtaining or attempting to obtain accreditation or certification.

(ii) Failure to meet the requirements of the [A]ct or this chapter.

(iii) Failure to meet applicable Federal or State standards relating to lead-based-paint activities.

(iv) Failure to pay a required fee.

(v) Failure to meet EPA standards for conducting lead-based-paint activities found at 40 CFR Part 745 (relating to lead-based poisoning prevention in certain residential structures).

34 Pa. Code § 203.5(a)(1)(i)-(v). Section 203.5(a)(1)(v) is a ground not included in Section 10(d)(1) of the Act.

(ii) In determining the penalty, consideration shall be given to appropriateness of the penalty to the gravity of the violation or violations, taking into account factors including history of prior violations; evidence of willfulness or failure to take reasonable precautions to prevent violations; and, the extent of exposure to hazardous conditions.

34 Pa. Code § 203.9(d)(1)-(2).

To support its assessment of a civil penalty of $14,000.00, the Department reasoned, in pertinent part, as follows:

[Petitioners] [have] been found in violation of 14 counts. The violations range over five (5) different properties and [16 1/2] months. They involved easily preventable items like workers not being properly licensed, as well as practice issues such as proper placement of poly and protecting occupants' belongings. At multiple sites, workers were not wearing appropriate protective clothing or respirators. [Petitioners] had been previously warned about workers being present on an expired camera card as well as workers not wearing protective clothes. Inspectors had previously informally discussed the failure of [Petitioners'] workers to comply with various requirements of the Act, the Department's regulations and federal regulations. Both the written and verbal warnings went unheeded as a worker was observed without proper protective clothing six (6) months later and another worker was on site with an expired camera card approximately 13 months later.

Given the number of violations[,] that [Petitioners] had been put on notice, either verbally, in writing, or both of the Bureau's perception that [Petitioners] may not be fully complying with specific regulatory requirements such as proof of licensure, the lack of HEPA vacuums, poly not being utilized appropriately to contain hazards and prevent contamination[,] and that several of the proven violations in the three (3) OSCs directly related to the potential further

15

> spread[14] of lead-based paint dust and chips due to improper preparation and cleaning practices, imposition of the full $14,000 civil penalty is clearly warranted.

(R.R. at 50a-51a) (internal citations omitted).

Regarding the suspension of Petitioners' certifications and licenses, the Department cited the considerations in 34 Pa. Code § 203.9(d)(2)(i) and noted that there was little evidence concerning Howland's size and capitalization. (Proposed Adjudication at 51.) As to the considerations in 34 Pa. Code § 203.9(d)(2)(ii), namely, the gravity of the violations, the history of prior violations, evidence of willfulness, the failure to take reasonable precautions, and exposure to hazardous conditions,[15] the Department concluded as follows:

> As concerns this second factor, there was compelling evidence of the grave nature of the violations[,] and this factor weighs heavily against [Petitioners]. Additionally, there appeared to be at least an unwillingness to take reasonable precautions to prevent violations in that [Petitioners] were advised verbally, in writing, or both of concerns with improperly licensed workers being present at the worksite and that employees were not wearing proper protective clothing, yet those violations persisted. Similarly, there was a recurring issue of [Petitioners'] failing to

---

[14] Worksite conditions at Petitioners' Park Avenue job site necessitated a stop-work order. (FOF ¶ 101.) The conditions posed direct threats to the health and safety of the property's occupants, and as a result, "the abatement work was shut down, mitigation efforts were expended by the local agency to clean and test the occupants' belong[ings] and space, and only after clean samples were returned [were] abatement efforts permitted to resume." (FOF ¶ 102.)

[15] We note that the considerations in Section 203.9(d)(2)(i)-(ii) of the Department's regulations appear to apply only to monetary civil penalties. Nevertheless, Petitioners rely on those provisions in their brief and do not object to the Department's consideration of them. Moreover, although not strictly required, consideration of the gravity of the violations, the history of prior violations, evidence of willfulness, the failure to take reasonable precautions, and exposure to hazardous conditions is reasonable in determining any penalty, including suspension.

16

properly place poly so that it would protect the ground in the area of abatement work.

The consistent failure to protect the ground from potential contamination, the failure to properly move or protect an occupant's possessions in the home, [and] the repeated failure to have a working HEPA vacuum available for housekeeping, all indicate that [Petitioners] (or certainly at least the workers and/or supervisors hired by [Petitioners]) do not take the spread of lead-based paint hazards seriously. As noted by Evan during his testimony, [Petitioners] have problems ensuring compliance with relatively simple administrative tasks such as getting workers to go get their camera cards in a timely manner, despite the worker being paid for the time to get the card.

. . . .

[ ] However, the violations proven against [Petitioners] include not only those administrative failings, but also an ongoing failure by [Petitioners] to stop the unsafe abatement practices by their workers.

[Petitioners'] workers are put at risk by [Petitioners'] failure to timely remedy the unsafe practices of not wearing appropriate clothing and PPE. [Petitioners'] customers and property owners are also placed at a heightened risk that they will end up with even greater contaminated soil and belongings due to the disturbance during abatement and [Petitioners'] workers' failure to properly protect the ground and belongings.

(Proposed Adjudication at 51-52, 53-54.) (underlining in original). The Department also noted the mitigating factors present in the record, including Petitioners' compliance improvement and their ultimate release from their job sites.[16]  *Id.* at 53-54.  The Department therefore concluded that the five-year suspensions sought by the Bureau

---

[16] The Department concluded that Petitioners' ultimate release from their job sites had little probative value.  The Department explained that the risk assessments performed at the end of jobs utilized only random sampling from the finished job that would not necessarily uncover hazards and potential contaminations present during the course of work. (R.R. at 829a.)

17

were too harsh and that three-year suspensions would sufficiently protect the public from future hazards, deter Petitioners from future violations, and serve as an example to other lead abatement specialists in the field. *Id.* at 52-53.

We discern no error of law or abuse of discretion in the Department's imposition of three-year suspensions. The Department applied the standards set forth in both the Act and the Department's regulations and imposed civil penalties and suspensions that are significantly milder than those requested by the Bureau. As to the suspensions in particular, the Department found that Petitioners engaged in ongoing, unremedied violations that posed significant, not *de minimis*, health and safety hazards to both Petitioners' workers and the owner-occupants of the properties where Petitioners had performed abatement work. The Department adequately considered the mitigating factors cited by Petitioners and concluded that they warranted reduced, but still substantial, suspensions that would further the legitimate purposes of the Act to protect the public and deter future violations. For those reasons, we cannot say that the Department erred or abused its discretion in imposing the subject suspensions.

## IV. CONCLUSION

Because we conclude that the Department neither abused its discretion nor erred as a matter of law in adjudicating Petitioners' violations of the Act and imposing commensurate sanctions, we affirm its January 22, 2025 order.

_____
PATRICIA A. McCULLOUGH, Judge

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Howland Company, LLC and      :
John Evan,      :
         Petitioners      :
     :
         v.      :     No. 214 C.D. 2025
     :
Department of Labor and Industry,      :
Bureau of Occupational and      :
Industrial Safety,      :
         Respondent      :

## ***ORDER***

AND NOW, this 24th day of June, 2026, it is ORDERED that the January 22, 2025 order of the Secretary of Labor and Industry is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge